## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF SOUTH CAROLINA

MARK STEVEN FELLOWS,

      Plaintiff,

v.

SAFETY HOLDINGS, INC. d/b/a
SAMBASAFETY,

      Defendant.

**Case No.:** 3:26-cv-01532-CMC

**COMPLAINT AND DEMAND FOR JURY TRIAL**

Mark Steven Fellows ("Plaintiff" or "Mr. Fellows") by and through his counsel brings the following Complaint against Safety Holdings, Inc., d/b/a SambaSafety US  ("Defendant" or "SambaSafety") for violations of the federal Fair Credit Reporting Act ("FCRA"), 15 U.S.C. §§ 1681, *et seq.*, arising out of an background check report, specifically a Motor Vehicle Report ("MVR"), that Defendant published to Uber, which falsely portrayed that Plaintiff's  standard driver's license was invalid, making him ineligible to work for Uber as an Uber driver.

### **INTRODUCTION**

1.     This is an individual action for damages, costs, and attorney's fees brought against Defendant pursuant to the Fair Credit Reporting Act, 15 U.S.C. §§ 1681, *et seq.* ("FCRA").

2.     Defendant is a consumer reporting agency that compiles and maintains files on consumers on a nationwide basis.  It sells consumer reports generated from its database and furnishes these consumer reports to users of such reports including, but not limited to, Uber, who use the reports to make decisions regarding whether to engage in a business transaction with certain consumers.

3. Defendant falsely reported to Uber, that Plaintiff's driver's license was invalid, making him ineligible to work for Uber. Defendant's reporting is grossly inaccurate and untrue.

4. Plaintiff's driver's license was, and is still, valid.

5. Uber suspended/deactivated Plaintiff's Uber account after receiving a background check report from Defendant, which erroneously showed that Plaintiff did not have an active, valid driver's license.

6. Defendant's inaccurate reporting could have easily been avoided had Defendant performed a cursory review of the widely available DMV records from South Carolina prior to publishing Plaintiff's report to his employer, Uber.

7. Had Defendant performed even a cursory review of the DMV records, it would have discovered that Plaintiff's personal driver's license was never invalid. Rather, it was Plaintiff's Commercial Driver's License ("CDL") only that was invalid.

8. Defendant does not employ reasonable procedures to assure the maximum possible accuracy of the information it reports regarding consumers. Defendant's failure to employ reasonable procedures resulted in Plaintiff's report being grossly inaccurate.

9. Defendant committed these violations pursuant to its standard policies and practices, which harm innocent consumers seeking employment by prejudicing their prospective or current employers with inaccurate motor vehicle record information.

10. Defendant's inaccurate report cost Plaintiff a good paying, flexible job.

11. As a result of Defendant's violations of the FCRA, Plaintiff has suffered a range of actual damages including, without limitation, loss of employment opportunities, wages, and benefits; loss of economic opportunities; loss of time and money trying to correct his background check report; the expenditure of labor and effort disputing and trying to correct the inaccurate

2

reporting; damage to his reputation; loss of sleep; lasting psychological damage; loss of capacity for enjoyment of life; and emotional distress, including mental anguish, anxiety, fear, frustration, humiliation, and embarrassment.

12. As a result of Defendant's conduct, action, and inaction, Plaintiff brings claims against Defendant for failing to follow reasonable procedures to assure maximum possible accuracy based on 15 U.S.C. § 1681e(b) of the FCRA, and for failing to conduct a reasonable reinvestigation to determine whether the information Plaintiff disputed – the "Withdrawn" status of his standard driver's license – was inaccurate and should be corrected in the subject consumer report, in violation of the FCRA, 15 U.S.C. § 1681i.

## PARTIES

13. Mark Steven Fellows ("Plaintiff" or "Mr. Fellows") is a natural person residing in West Columbia, South Carolina, and is a "consumer" as that term is defined in 15 U.S.C. § 1681a(c).

14. Defendant Safety Holdings, Inc., d/b/a Sambasafety US G&M Hire Enterprises, LLC d/b/a AtBackgrounds ("Defendant" or "SambaSafety") is a Delaware corporation doing business throughout the United States, including the State of South Carolina and in this District, and has a principal place of business located at 8801 Horizon Blvd NE, Suite 200 , Albuquerque, NM 87113 and can be served at its registered agent at CT Corporation System, 206 S. Coronado Ave., Espanola, NM 87532.

15. Among other things, Defendant sells background check reports, including Driver Record Reports, to online service platforms like Uber for their use in deciding whether to offer its platform and range of services to potential consumers looking to offer its services, such as in this case, transportation services.

3

16.    These reports are provided for the purpose of evaluating a consumer for employment such that they may offer their driving services on the Uber platform to earn income.

17.    Further, these reports are also provided in connection with a business transaction initiated by the consumer.

18.    Defendant is a consumer reporting agency as defined in 15 U.S.C. § 1681a(f) because for monetary fees, it regularly engages in the practice of evaluating and/or assembling information on consumers for the purpose of furnishing consumer reports for employment purposes to third parties, and uses interstate commerce, including the Internet, for the purpose of preparing and furnishing such consumer reports.

## JURISDICTION AND VENUE

19.    This Court has jurisdiction over Plaintiff's claims pursuant to 28 U.S.C. § 1331 and 15 U.S.C. § 1681p, which allows claims under the FCRA to be brought in any appropriate court of competent jurisdiction.

20.    Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(1) because Defendant resides in this District.

## STATUTORY BACKGROUND

21.    Enacted in 1970, the FCRA's passage was driven in part by two related concerns: first, that consumer reports were playing a central role in people's lives at crucial moments, such as when they applied for a job or credit, and when they applied for housing.  Second, despite their importance, consumer reports were unregulated and had widespread errors and inaccuracies.

22.    While recognizing that consumer reports play an important role in the economy, Congress wanted consumer reports to be "fair and equitable to the consumer" and to ensure "the

4

confidentiality, accuracy, relevancy, and proper utilization" of consumer reports.  15 U.S.C. § 1681.

23.    Congress, concerned about inaccuracies in consumer reports, specifically required consumer reporting agencies to follow "reasonable procedures to assure maximum possible accuracy" in consumer reports. 15 U.S.C. § 1681e(b).

24.    Consumer reports that contain factually incorrect information which does not belong to the consumer at issue are neither maximally accurate nor fair to the consumers who are the subjects of such reports.

**THE FCRA'S PROTECTIONS FOR BUSINESS TRANSACTIONS**

25.    Despite its name, the Fair Credit Reporting Act covers more than just credit reporting, it also regulates employment background check reports like the one Defendant prepared in Plaintiff's name.

26.    The FCRA provides a number of protections for job applicants who are the subject of background checks for purposes of securing employment, housing, and other purposes.

27.    In the parlance of the FCRA, background checks are "consumer reports," and providers of background checks, like Defendant, are "consumer reporting agencies."  15 U.S.C. §§ 1681a(d) and (f).

28.    The FCRA imposes duties on consumer reporting agencies to assure that consumer reports are accurate and that "consumer reporting agencies exercise their grave responsibilities with fairness, impartiality, and a respect for the consumer's right to privacy." 15 U.S.C. § 1681.

29.    Under 15 U.S.C. § 1681e(b), consumer reporting agencies are required "to follow reasonable procedures to assure maximum possible accuracy of the information concerning the individual about whom the report relates."

30.    Defendant disregarded its duties under the FCRA with respect to Plaintiff's background check report.

## DEFENDANT'S ILLEGAL BUSINESS PRACTICES

31.    Over the past 15 years, there has been increased collection and aggregation of consumer data, including criminal records and sex offender registration data.  As a result of the increasing availability of this data, there has been a boom in the background check industry.

32.    As summarized in a recent report by the Consumer Financial Protection Bureau, a 2018 survey of employers found that 95 percent of employers surveyed conducted one or more types of background screening.

33.    The background check industry takes in revenues in excess of three billion dollars, annually.

34.    Background checks are generally created by running automated searches through giant databases of aggregated public record data.  The reports are created and disseminated with little to no manual, in-person review, and the underlying records are rarely directly reviewed in creating background checks.

35.    Background check companies, like Defendant, collect, among other things, countless motor vehicle records ("MVR") from a number of sources with data from county, state, and federal level sources.

36.    Given that Defendant is in the business of selling background checks, Defendant should be well aware of the FCRA and the attendant harm to consumers for reporting inaccurate or outdated information.

37.    Defendant places its business interests above the rights of consumers and reports such inaccurate information because it is cheaper for Defendant to produce reports containing

information that is inaccurate and incomplete than it is for Defendant to exert proper quality control over the reports prior to their being provided to Defendant's customers.

38.    Defendant reports such erroneous and incomplete information because it wants to maximize the automation of its report creation process, thereby saving the costs associated with conducting the additional review necessary to remove the inaccurate or out-of-date entries.

39.    Defendant charges its customers the same price for reports that are grossly inaccurate as it does for accurate reports.

40.    Appropriate quality control review of Plaintiff's report would have made clear that Defendant was reporting that Plaintiff had a withdrawn standard driver's license when his driver's license was in fact valid.

41.    As a provider of background check reports, Defendant should be aware of the FCRA requirements and is likely a member of the Professional Background Screening Association ("PBSA"). PBSA hosts a conference at least once a year where presenters discuss compliance with federal and state consumer reporting laws.

## FACTS

### Plaintiff Begins Working for Uber and Gets Suspended

42.    Prior to Plaintiff working at Uber, Uber contracted with Defendant to conduct background checks, including motor vehicle records background checks, on its prospective and current drivers listed on the Uber platform.

43.    In March 2025, Plaintiff began working for Uber as his full-time job. Between March and November 2025, Plaintiff was earning approximately $1000-$1,500 per week working for Uber. Plaintiff had no issue getting approved for Uber in March 2025.

7

44.     Sometime in November 2025, Uber ordered a Driver Record Report ("consumer report") on Plaintiff from Defendant.

45.     In accordance with its standard procedures, Defendant completed its consumer report about Plaintiff and sold the same to Uber.

46.     Within that consumer report, Defendant published inaccurate information about Plaintiff.

47.     Specifically, it contained the following information:

```
License and Permit Information
License: COMMERCIAL      Issue: 02/23/2023   Expire: 02/23/2031   Status: INVALID                  Issued: RENEWAL
    Class: A  COMBINE VEH > 26K W/TRAILER> 10K - REAL ID                        Explanation: DISQUALIFIED
            Endorsement: TANKS
License: PERSONAL        Issue: 02/23/2023   Expire: 02/23/2031   Status: INVALID                  Issued: RENEWAL
    Class: A  COMBINE VEH > 26K W/TRAILER > 10K
            Endorsement: TANKS
```

48.     Plaintiff's consumer report by Defendant provided that both his commercial and personal driver's licenses were invalid. But that was not true.

49.     On December 1, 2025, Plaintiff tried to log into his Uber app to start working. To his surprise, his Uber account was suspended. Plaintiff immediately reached out to Uber to inquire about the suspension and deactivation and try to get back online.

50.     On December 2, 2025, Uber sent Plaintiff an email that stated: "Based on the results of your background check from our third-party vendor, Samba Safety, the driver's license provided is not valid." At this time, Plaintiff had not yet seen a copy of the Samba Safety report allegedly provided to Uber.

51.     Between December 1, 2025 and February 2026, Plaintiff communicated with Uber's support representatives consistently.

/ /

**Plaintiff Reaches Out to SambaSafety**

52.     In order to investigate what happened with his Uber account, Plaintiff reached out online to Defendant SambaSafety several times in December 2025 to request a copy of the report that was provided to Uber. However, he did not receive a response until December 25, 2025, when SambaSafety emailed him a copy of his SambaSafety Motor Vehicle Record **dated** November 5, 2025 ("MVR").

53.     The email from Defendant stated that four entities, including Uber, had requested his SambaSafety MVR in the last 24 months.

54.     The information dated November 5, 2025 in this report would have been the same information which lead to the deactivation of Plaintiff's Uber account.

55.     Plaintiff has a commercial driver's license ("CDL") in addition to his personal, non-commercial driver's license, but to drive for Uber, only a personal, non-commercial driver's license is required. The status of a person's CDL (or whether they even have one) is irrelevant to the qualifications to drive for Uber.

56.     The November 5, 2025 SambaSafety MVR was labeled "STATUS: SEE BELOW." Then, in the "Suspension/Revocations" section of the report SambaSafety listed a "disqualification" record *without specifying the "disqualification"* was only specific to commercial driving privileges.

57.     Then, in the "License and Permit Information" section, SambaSafety included two entries for Plaintiff's current driver's license, "License: Commercial" and "License: Personal," both of which were reported with "**Status: INVALID**." This is completely false, however, because at the time, Plaintiff's personal driver's license was active and **valid**.

9

58.     In South Carolina, in a 10-year Driver Record, the "Status-DL" refers to the status of a person's non-commercial driver's license(s) (including Classes D, E, and F, where Class D is the regular personal license). The South Carolina DMV will list only one of two options for that status: "NO SUSPENSION" and "SUSPENDED." A status of NO SUSPENSION means the individual has a valid and active license to drive a non-commercial vehicle, as Plaintiff did, and does.



59.     Defendant does not have reasonable procedures in place to understand how to read and interpret South Carolina driver records.

### Uber Responds to Plaintiff's Inquiries

60.     On December 27, 2025, Uber Support responded to one of Plaintiff's inquiries and stated the following: "Based on the results of your background check from our third-party vendor, Samba Safety, the driver's license provided **is not valid.**"

61.     At Uber's request, Plaintiff resubmitted his Driver's License two to three times in December 2025 on the Uber app to prompt a new background check.

### Plaintiff's First Dispute to Defendant

62.     On December 31, 2025, Plaintiff submitted an online dispute to SambaSafety explaining that his license is valid. He attached a copy of his South Carolina driving record above to his dispute as proof of his license validity.

63.     On December 31, 2025, SambaSafety emailed Plaintiff to confirm receipt of his dispute.

64.     On January 7, 2026, SambaSafety emailed Plaintiff to provide an "update" on his dispute. The "update" stated the following:

"After careful review, including reviewing the supporting documentation you provided, we have determined that further investigation is necessary. **Our Specialized Team has confirmed that your personal license status should be reported as valid**. We are working closely with the appropriate parties to accurately reflect the personal license status. Additionally, we have reached out to Uber to inform them of our findings. We will reach back out to confirm when a new MVR should be ordered by your employer to reflect these updates electronically. Again, we sincerely appreciate your continued patience while we resolve this dispute."

65.     On January 22, 2026, SambaSafety sent him another email that said: "We sincerely appreciate your continued patience as we work to resolve your dispute submitted on 12/31/25. As of now, there are no new developments to report at this time. Please be assured that our dedicated team is actively addressing the matter and remains committed to reaching a fair and timely resolution. We continue to work closely with the appropriate parties to accurately reflect your personal license status. We understand the importance of this issue and appreciate your understanding throughout the process. We will provide you with an update as soon as additional information becomes available."

66.     On January 30, 2026, Plaintiff received an email from SambaSafety that stated the following: "Thank you for your patience as we worked to resolve your recent dispute submitted on 12/31/2025. We are pleased to provide you with an update regarding your dispute. An update was completed, and we have confirmed that the personal license status is now reporting valid. To ensure this update is reflected in your Motor Vehicle Record (MVR), a new MVR must be ordered by Uber. To initiate this process, please follow the steps below: ..."

67. This new email then directed Plaintiff to re-submit his driver's license to Uber in order to have Uber request a new MVR from SambaSafety, again. Based on the email, Defendant SambaSafety refused to provide a corrected MVR on its own without an additional request.

68. Instead, Defendant told Plaintiff to request a new report from Uber when Defendant should have provided the corrected report to Uber.

69. Nothing had changed concerning Plaintiff's actual South Carolina Driver Record – it was always accurate. Only Defendant's report was inaccurate because it reported Plaintiff had an invalid non-commercial driver's license when it was valid.

70. Defendant only needed to send a corrected report to Uber; there was no reason for Plaintiff and Uber to request a brand new report from SambaSafety.

71. Defendant also refused to send a corrected report to Plaintiff in violation of the FCRA § 1681i(a)(6).

**The Second Inaccurate Report to Uber and Second Dispute to SambaSafety**

72. On or about January 2, 2026, Uber requested a new report from SambaSafety. That same day, SambaSafety published a **second** report about Plaintiff to Uber that **again** indicated Plaintiff's driver's license had a status of "Invalid."

73. On that same day, January 2, 2026, Plaintiff submitted a *new* online dispute form to SambaSafety. Again, Plaintiff attached a copy of his South Carolina driving record to the dispute and explained that his regular driver's license was valid and only his commercial privileges were restricted.

74. Upon information and belief, Plaintiff did not receive a response to his January 2, 2026 dispute.

**Third Dispute to SambaSafety**

75.     On January 23, 2026, Plaintiff submitted a third online dispute form online to SambaSafety. As of March 8, 2026, Plaintiff had not received a response to his third dispute. **The Results of SambaSafety' Failures**

76.     On February 23, 2026, Plaintiff spoke to Uber Support over the phone. Uber Support confirmed that Plaintiff's account had been reactivated. He was able again to drive for Uber.

77.     However, by the time Defendant had corrected Plaintiff's report and Uber reactivated Plaintiff's account, he had already secured another job working for a local truck driving company during the week.

78.     At this time, Plaintiff plans to use Uber to earn additional income on the weekends.

79.     The "invalid" status of Plaintiff's driver's license reported by Defendant about is completely inaccurate.

80.     Plaintiff had, and currently has, an active, valid driver's license.

81.     A cursory review of the widely available motor vehicle records confirms that Plaintiff driver's license was never withdrawn.  Rather, the record confirms that only Plaintiff's CDL was invalid, which is not required to work on the Uber platform as an Uber driver.

82.     The sole reason the inaccurate "invalid" driver's license status was reported on the consumer report concerning Plaintiff was that Defendant failed to follow reasonable procedures to assure the maximum possible accuracy of the information it published within the consumer report it sold about Plaintiff to Uber.

83.     Had Defendant followed reasonable procedures, it would have discovered that Plaintiff's driver's license was never invalid and would not have reported the same.

13

84.     In preparing and selling a consumer report about Plaintiff, wherein Defendant published to Uber inaccurate information about Plaintiff, Defendant failed to follow reasonable procedures to assure that the report was as accurate as maximally possible, in violation of 15 U.S.C. § 1681e(b).

85.     But for Defendant's inaccurate consumer report, Plaintiff would have continued to work as an Uber driver, and Plaintiff would have been spared the humiliation, embarrassment, and stress imposed upon Plaintiff to correct Defendant's erroneous reporting.

86.     Defendant's false report cost Plaintiff a well-paying, flexible job and ability to earn income through the Uber platform.

87.     Due to Defendant's unreasonable procedures and shoddy, if any, dispute reinvestigation, and despite Plaintiff's continued efforts, as of the date hereof, Plaintiff missed out on months of income from Uber.

88.     The injuries suffered by Plaintiff as a direct result of Defendant's erroneous reporting are the type of injuries that the FCRA was enacted to address. Under common law, Defendant's conduct would have given rise to causes of action based on defamation and invasion of privacy.

89.     As a result of Defendant's violations of the FCRA, Plaintiff has suffered a range of actual damages including, without limitation, loss of employment opportunities, wages, and benefits; loss of economic opportunities; loss of time and money trying to correct his background check report; the expenditure of labor and effort disputing and trying to correct the inaccurate reporting; damage to his reputation; loss of sleep; lasting psychological damage; loss of capacity for enjoyment of life; and emotional distress, including mental anguish, anxiety, fear, frustration, humiliation, and embarrassment.

## CLAIMS FOR RELIEF

### COUNT I
### 15 U.S.C. § 1681e(b)
### Failure to Follow Reasonable Procedures to Assure Maximum Possible Accuracy

83.     Plaintiff re-alleges and incorporates by reference the allegations set forth in the preceding paragraphs as if fully stated herein.

84.     Defendant is a "consumer reporting agency" as defined by 15 U.S.C. § 1681a(f).

85.     At all times pertinent hereto, Plaintiff was a "consumer" as that term is defined by 15 U.S.C. § 1681a(c).

86.     At all times pertinent hereto, the above-mentioned MVR Report or consumer report was a "consumer report" as that term is defined by 15 U.S.C. § 1681a(d).

87.     Defendant violated 15 U.S.C. § 1681e(b) by failing to establish or to "follow reasonable procedures to assure maximum possible accuracy" in the preparation of the consumer report it sold about Plaintiff as well as the information it published within the same.

88.     As a result of Defendant's violations of the FCRA, Plaintiff has suffered a range of actual damages including, without limitation, loss of employment opportunities, wages, and benefits; loss of economic opportunities; loss of time and money trying to correct his background check report; the expenditure of labor and effort disputing and trying to correct the inaccurate reporting; damage to his reputation; loss of sleep; lasting psychological damage; loss of capacity for enjoyment of life; and emotional distress, including mental anguish, anxiety, fear, frustration, humiliation, and embarrassment.

89.     Defendant willfully violated 15 U.S.C. § 1681e(b) in that its conduct, actions, and inactions were willful, rendering them liable for actual or statutory damages, and punitive damages

in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n.  Alternatively, they were negligent, entitling Plaintiff to recover under 15 U.S.C. § 1681o.

90.     Plaintiff is entitled to recover statutory damages, punitive damages, and reasonable attorneys' fees and costs from Defendant in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n and/or § 1681o.

**COUNT II**
**15 U.S.C. § 1681i**
**Failure to Perform a Reasonable Reinvestigation**

91.     Plaintiff re-alleges and incorporates by reference the allegations set forth in the preceding paragraphs as if fully stated herein.

92.     The FCRA mandates that a CRA conducts an investigation of the accuracy of information "[I]f the completeness or accuracy of any item of information contained in a consumer's file" is disputed by the consumer.  *See* 15 U.S.C. § 1681i(a)(1).  The Act imposed a 30-day time limit for the completion of such an investigation.  *Id*.

93.     The FCRA provides that if a CRA conducts an investigation of disputed information and confirms that the information is in fact inaccurate or is unable to verify the accuracy of the disputed information, the CRA is required to delete that item of information from the consumer's file.  *See* 15 U.S.C. § 1681i(a)(5)(A).

94.     On at least one occasion during 2025 and/or 2026, Plaintiff disputed the inaccurate information with Defendant and requested that Defendant correct the inaccurate information in the consumer report that is patently inaccurate, misleading, and highly damaging to him.

95.     In response to Plaintiff's dispute, Defendant failed to conduct a reinvestigation, or such investigation was so shoddy as to allow patently false, logically inconsistent, and damaging information to remain in the consumer report and refused to correct the consumer report at issue.

16

96.     Defendant also refused to send a corrected report to Plaintiff in violation of the 15 U.S.C. § 1681i(a)(6).

97.     Defendant violated 15 U.S.C. § 1681i by failing to conduct a reasonable reinvestigation to determine whether the disputed information was inaccurate; by failing to correct the disputed inaccurate information from the subject consumer report; by failing to follow reasonable procedures with which to filter and verify disputed information in Plaintiff's credit file; and/or by relying upon verification from a public source it has reason to know is unreliable.

98.     As a result of Defendant's violations of the FCRA, Plaintiff has suffered a range of actual damages including, without limitation, loss of employment opportunities, wages, and benefits; loss of economic opportunities; loss of time and money trying to correct his background check report; the expenditure of labor and effort disputing and trying to correct the inaccurate reporting; damage to his reputation; loss of sleep; lasting psychological damage; loss of capacity for enjoyment of life; and emotional distress, including mental anguish, anxiety, fear, frustration, humiliation, and embarrassment.

99.     Defendant willfully violated 15 U.S.C. § 1681i in that its conduct, actions, and inactions were willful, rendering them liable for actual or statutory damages, and punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n.  Alternatively, they were negligent, entitling Plaintiff to recover under 15 U.S.C. § 1681o.

100.     Plaintiff is entitled to recover statutory damages, punitive damages, and reasonable attorneys' fees and costs from Defendant in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n and/or § 1681o.

/ /

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays for the following relief:

i.  Determining that Defendant negligently and/or willfully violated the FCRA;

ii.  Awarding Plaintiff actual, statutory, and punitive damages as provided by the FCRA;

iii.  Awarding Plaintiff reasonable attorneys' fees and costs as provided by the FCRA; and,

iv.  Granting further relief, in law or equity, as this Court may deem appropriate and just.

## DEMAND FOR JURY TRIAL

Plaintiff is entitled to and hereby demands a trial by jury on all issues so triable.

RESPECTFULLY SUBMITTED on this 13th of April 2026.

By: */s/ Dawn McCraw*
Dawn McCraw (Fed ID No. 13710)
**Consumer Justice Law Firm PLC**
8095 North 85th Way
Scottsdale, Arizona 85258
Phone: (602) 807-1527
Fax: (480) 613-7733
Email: dmccraw@consumerjustice.com

*Attorneys for Plaintiff Mark Steven Fellows*